# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* Matthew McDonald and Matthew McDonald Individually, | ) ) ) **CASE NO. 8:13-CV-1705-T23-TGW** |
| | ) |
| **STATE OF FLORIDA, ex rel. Matthew McDonald;** | ) ) **FILED UNDER SEAL** |
| | ) |
| | ) **PLAINTIFF'S FIRST AMENDED** |
| | ) **COMPLAINT PURSUANT TO 31** |
| | ) **U.S.C. § 3729(a)(1)(A)(B)(C)** |
| | ) **FEDERAL FALSE CLAIMS ACT** |
| | ) **AND FLORIDA STATE FALSE** |
| Plaintiffs, | ) **CLAIMS ACT** |
| | ) |
| | ) |
| **v.** | ) **JURY TRIAL DEMANDED** |
| | ) |
| **WALTER INVESTMENT** | ) |
| **MANAGEMENT CORPORATION,** | ) |
| **GREEN TREE SERVICING, LLC,** | ) |
| **REVERSE MORTGAGE** | ) |
| **SOLUTIONS, INC.,** | ) |
| **REO MANAGEMENT** | ) |
| **SOLUTIONS, LLC,** | ) |
| **RMS ASSET MANAGEMENT** | ) |
| **SOLUTIONS, LLC,** | ) |
| **UNIFIED REAL ESTATE** | ) |
| **MANAGEMENT,** | ) |
| **BANK OF AMERICA CORPORATION,** | ) |
| **BANK OF AMERICA HOME LOANS,** | ) |
| **WELLS FARGO & COMPANY,** | ) |
| **WELLS FARGO HOME MORTGAGE,** | ) |
| **COMPU-LINK CORPORATION OF MI,** | ) |
| **FINANCIAL FREEDOM** | ) |
| **ACQUISITION, LLC,** | ) |
| **ONEWEST BANK, FSB** | ) |

CLERK'S DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA
2013 DEC -4  PM 3: 44
FILED

```
                                    )
          Defendants               )
                                    )
_____)
```

## FIRST AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729(a)(1)(A)(B)(C) AND FLORIDA FALSE CLAIMS ACT

1.      Pursuant to Rule 15(a) of Federal Rules of Civil Procedure, *qui tam* Relator, **Matthew McDonald**, in the name of the United States of America and the State of Florida, files this First Amended Complaint action as a matter of right under 31 U.S.C. § 3729(a)(1)(A)(B)(C) ("False Claims Act") to recover all damages, penalties and other remedies from Defendants, **Walter Investment Management Corporation (WIMC), Green Tree Servicing, LLC. (Green Tree), Reverse Mortgage Solutions, Inc. (RMS), REO Management Solutions, LLC (REOMS), RMS Asset Management Solutions, LLC (AMS), Unified Real Estate Management (UREM), Bank Of America Corporation (BOA), Bank of America Home Loans (BOA Home), Wells Fargo & Company (Wells Fargo), Wells Fargo Home Mortgage (WFHM), Compu-Link Corporation of MI** (which does business as **CeLink**), **Financial Freedom Acquisition, LLC (FFA),** and **OneWest Bank, FSB (OWB)**, unlawful and fraudulent practices and wrongful termination of Relator, **Matthew McDonald**, as detailed herein. These unlawful and fraudulent practices have economically harmed the United States Government and State of Florida, and are prohibited under the federal **False Claims Act.**

## I. INTRODUCTION

2.      The mortgage industry has faced many challenges, putting strain on individuals, banks, the Court system, and federal and state government agencies.

3.      The mortgage industry has a long standing history of Government involvement.  In 1934 the Federal Housing Administration (FHA) was established by the National Housing Act of 1934.   In 1938 The Federal National Mortgage Association, known as Fannie Mae (FNMA), was created.  As noted by the U.S. Department   of   Housing   and   Urban   Development   (HUD)   website (http://portal.hud.gov/hudportal/HUD?src= /about/hud_history):

> *"In 1965, the Department of Housing and Urban Development Act of*
> *1965 creates HUD as Cabinet-level agency.  In 1992, the Federal Housing*
> *Enterprises' Financial Safety and Soundness Act of 1992 creates HUD Office of*
> *Federal Housing Enterprise Oversight to provide public oversight of FNMA and*
> *Federal Home Loan Mortgage Corporation (Freddie Mac).  In 1998, HUD*
> *opens Enforcement Center to take action against HUD-assisted multifamily*
> *property owners and other HUD fund recipients who violate laws and regulations.*
> *Congress approves Public Housing reforms to reduce segregation by race and income,*
> *encourage and reward work, bring more working families into public housing, and*
> *increase the availability of subsidized housing for very poor families.  In 2000,*
> *America's homeownership rate reaches a new record-high of 67.7 percent in the*

*third quarter of 2000. A total of 71.6 million American families own their homes, more than at any time in American history."*

4.      According to the Federal Bureau of Investigation, *"Mortgage fraud schemes are particularly resilient, and they readily adapt to economic changes and modifications in lending practices. Mortgage fraud perpetrators include licensed/registered and non-licensed/registered mortgage brokers, lenders, appraisers, underwriters, accountants, real estate agents, settlement attorneys, land developers, investors, builders, bank account representatives, and trust account representatives."*      (http://www.fbi.gov/stats-services/publications/mortgage-fraud-2010/2010-mortgage-fraud-report)

5.      This suit concerns fraud perpetrated against the U.S. Government through false and fraudulent claims in the mortgage industry. As a result of this nationwide scheme, **Walter Investment Management Corporation (WIMC), Green Tree Servicing, LLC. (Green Tree), Reverse Mortgage Solutions, Inc. (RMS), REO Management Solutions, LLC (REOMS), RMS Asset Management Solutions, LLC (AMS), Unified Real Estate Management (UREM), Bank Of America Corporation (BOA), Bank of America Home Loans (BOA Home), Wells Fargo & Company (Wells Fargo), Wells Fargo Home Mortgage (WFHM), Compu-Link Corporation of MI** (which does business as **Celink**), **Financial Freedom Acquisition, LLC (FFA),** and **OneWest Bank, FSB (OWB),** reaped profits far beyond those it would have achieved from legitimate practices of their businesses. Further, **RMS** engaged in other fraudulent kickback schemes as detailed below, in

5

order to compel additional funds through disposing of Real Estate Owned ("REO") for Fannie Mae ("FNMA").

## II. PARTIES

6.     **Matthew McDonald** ("McDonald" or "Relator") is a citizen of the United States of America and resident of the state of Florida.  Relator, **McDonald** brings this civil action for violations of 31 U.S.C. § 3729(a)(1)(A)(B)(C), for himself and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

7.     Defendant, **Walter Investment Management Corporation** ("WIMC" or "Defendants"), is a national corporation with its principal place of business in Tampa, Florida.  **Walter Investment Management Corporation** conducts extensive business in the States of Florida, California, Illinois, Indiana, Louisiana, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, Tennessee, Texas and Wisconsin, The Commonwealth of Massachusetts and Virginia, and the District of Columbia.

8.     Defendant, **Green Tree Servicing, Inc.** ("Green Tree" or "Defendants"), is a wholly owned subsidiary of Walter Investment Management Corporation, with its corporate office located at 345 St. Peter Street, St. Paul, MN 55102. Green Tree Servicing, Inc. conducts extensive business nationally.

9.     Defendant, **Reverse Mortgage Solutions, Inc.** ("RMS" or "Defendants"), is a wholly owned subsidiary of Walter Investment Management Corporation, with its

corporate office located at 2727 Spring Creek Dr., Spring, TX 77373. Reverse Mortgage Solutions, Inc. conducts extensive business nationally.

10.    Defendant, **REO Management Solutions, LLC** ("REOMS" or "Defendants"), is located at 5222 Cypress Creek Parkway, Houston, TX 77069 and conducts extensive business nationally.

11.    Defendant, **RMS Asset Management Solutions, LLC** ("AMS" or "Defendants"), is a subsidiary company of RMS and located at 5222 FM 1960 West, Suite 105, Houston, TX 77069 and conducts extensive business nationally.

12.    Defendant, **Unified Real Estate Management** ("UREM"), is a full service management company for multifamily properties and a subsidiary of Unified Property Group, located at 2200 Genoa Business Park Drive, Suite 100, Brighton, MI 48114. **UREM** conducts extensive business nationally.

13.    Defendant, **Bank Of America Corporation** ("BOA" or "Defendants"), is an American multinational banking and financial services corporation with its principal place of business located in the Bank of America Corporate Center, 100 North Tryon Street, Charlotte, NC 28255. Bank Of America Corporation conducts extensive business nationally.

14.    Defendant, **Bank of America Home Loans** ("BOA Home" or "Defendants"), is the mortgage unit of **Bank of America Corporation** and conducts extensive business nationally.

15.    Defendant, **Wells Fargo & Company** ("WFC" or "Defendants"), is an American multinational banking and financial services holding company with operations around the world, with its corporate office located at 420 Montgomery Street, San Francisco, CA 94104.  **Wells Fargo & Company** conducts extensive business nationally.

16.    Defendant, **Wells Fargo Home Mortgage** ("WFHM" or "Defendants"), is a division of Wells Fargo Bank, NA, which is a subsidiary of **Wells Fargo & Company** and conducts extensive business nationally.

17.    Defendant, **Compu-Link Corporation of MI** ("Celink" or "Defendants"), is a Reverse Mortgage Servicer which does business as **Celink**, is a privately held company, and was incorporated in Michigan in May 1969.  **Celink** conducts extensive business nationally with its corporate office located at 3900 Capital City Boulevard, Lansing, MI 48906.

18.    Defendant, **OneWest Bank, FSB** ("OneWest" or "Defendants"),  is a California-based federal savings bank which formed on March 19, 2009 with its acquisition of certain assets and certain limited liabilities of IndyMac Federal Bank, FSB from the FDIC, with its corporate headquarters located at 888 East Walnut Street Pasadena, CA 91101-1802.  **OneWest** conducts extensive business nationally.

19.    Defendant, **Financial Freedom Acquisition, LLC** ("Financial Freedom" or "Defendants"), was incorporated in 2009 and operates as a subsidiary of **OneWest Bank, FSB**.  **Financial Freedom** conducts extensive business nationally.

## III. JURISDICTION AND VENUE

20.     This action arises under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)(B)(C).

21.     Jurisdiction over this action is conferred on this Court by 31 U.S.C. 3732(a) and 28 U.S.C. 1331 in that this action arises under the laws of the United States of America.

22.     Venue is proper in the United States District Court for the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a) because the Defendant, transacts business in this District and the facts forming the basis for the Complaint occurred in this District.

## IV. PRELIMINARY STATEMENT

23.     Relator, **McDonald**, was an employee of **Walter Investment Management Corporation**, and until recently held the position of Interim Chief Financial Officer of **RMS**.     Relator, **McDonald** was employed with **Walter Investment Management Corporation**, from approximately April 1, 2013, until his constructive termination November 20, 2013.  Relator, **McDonald**, began as a Consultant with **Walter Investment Management Corporation** in October of 2012, till his full time employment in April 2013.

24.     **Walter Investment Management Corporation** ("WIMC") is a publicly traded company on the NYSE under the symbol WAC and acquired **RMS** on November, 1, 2012.  **RMS** is an approved servicer of FHA / HUD and FNMA.

25.     **RMS** is in the business of reverse mortgages, which are government Federal Housing Administration ("FHA") insured loans available to seniors. **RMS** originates, securitizes loans into Government National Mortgage Association (GNMA) securities, and services the loans through their lifecycle. Specifically, **RMS** is in the business of servicing reverse mortgages. Due to the nature of the loans, many of these loans end up in default and foreclosure. At the end of the foreclosure cycle, the servicer files a claim to HUD for the insurance to cover losses.

26.     The guidelines are very specific as to servicing through the default cycle, and the insurance claim process. Under FHA regulations, servicers are required to meet a series of event-specific timeframes during the default, foreclosure, conveyance, and mortgage insurance claim cycles. Failure to timely meet any processing deadline stops the accrual of debenture interest otherwise payable in satisfaction of a claim under the FHA mortgage insurance contract. The servicer is responsible for making the investor whole for any interest curtailment due to not meeting the required event-specific timeframes.

27.     When a borrower defaults (most common causes are due to death, or not paying taxes or property insurance) there is a "Due and Payable Date" established, and the servicer has to take certain actions with specific timeframes from that date. One of the first actions required is to obtain an appraisal within thirty (30) days of the Due and Payable date (24 CFR § 206.125(b)), and if the servicer does not obtain the appraisal within thirty (30) days then HUD will not reimburse interest at the

debenture rate of interest from the date the appraisal should have been obtained, to the date the claim is paid. Defendants' practice of not self-disclosing on the insurance claim that they did not obtain the appraisal within the required timeline, constitutes a false or misleading mortgage insurance claim with HUD, resulting in HUD paying the debenture interest for the entire period up through the date the claim is paid.

28. Specifically, **RMS** historically has not self-disclosed this event to HUD on insurance claims as required by 24 CFR 206.125, which is called self-curtailment, resulting in HUD over paying on the insurance claim. The average **RMS** has calculated as the overpayment by HUD is in excess of seventeen thousand dollars ($17,000.00) per instance. The total exposure of **RMS** to have missed or late appraisals for filed claims, claims in the process of being filed, and future claims to be filed, is thirty-seven million dollars ($37,000,000.00) and growing.

29. When a borrower defaults, there is a Due and Payable Date established, and the servicer has to take certain actions with specific timeframes from that date. A required action is to take "first legal action" (24 CFR § 203.355) toward foreclosure within six (6) months of the Due and Payable date, unless an extension of such date is granted (24 CFR § 206.129). If the servicer does not to take "first legal action" within six (6) months, then HUD will not reimburse interest at the debenture rate of interest from the date the first legal action should have been taken, to the date the claim is paid.

30.     Specifically, if **RMS** does not disclose on the insurance claim that **RMS** did not take "first legal action" within the required timeline, the result is **RMS** filing a false or misleading mortgage insurance claim with HUD, resulting in HUD paying the debenture interest for the entire period up through the date the claim is paid.  Even if the **Defendants** do self-curtail (resulting in the claim being paid in the correct amount by HUD) there is still an issue as the investor will not realize the claim amount paid is lower by the curtailed debenture interest, which is due to the servicer error, and therefore recoverable by the investor.  One of the largest investors in insured reverse mortgages is Fannie Mae (FNMA).  The average **RMS** has calculated as the overpayment by HUD is in excess of twelve thousand dollars ($12,000.00) per occurrence.  The total exposure of **RMS** to missed first legal for filed claims, claims in the process of being filed, and future claims to be filed is fifteen million dollars ($15,000,000.00) and growing.  If the **Defendants** already filed (and files in the future) accurate claims for all issues with missed appraisals and first legal actions, FNMA would receive claim payments that would be approximately twenty-three million dollars ($23,000,000.00) less than they would have received if the **Defendants** had serviced the loans according to the regulations.  Unless FNMA can determine this on a loan by loan basis and then bill and collect the shortfall from the **Defendants**, despite the complexities of the systems, then the **Defendants** will have shorted FNMA potentially millions of dollars.

31.    **RMS** services portfolios of loans previously serviced by **Bank of America**, much of which is owned by FNMA.  **RMS** has identified an additional one-hundred and forty million dollars plus ($140,000,000.00+) of curtailment exposure related non-compliance that occurred while **Bank of America** was servicing the loans.  With the bulk of these being FNMA owned loans, either HUD is going to overpay due to false claims being filed (**RMS** does not have a policy on how to file these claims), or if the claims are filed correctly, FNMA will receive less than what is owed them. **Relator** expresses that approximately more than sixty percent (60%) of the one-hundred and forty million dollars ($140,000,000.00) relates to FNMA owned loans, in turn FNMA would need to research how they were shorted by over eighty million dollars ($80,000,000.00) on a loan by loan basis, which would be very challenging.

32.    Further corroborative of **McDonald's** claims are recent SEC disclosures by **WIMC**.  Defendant, **WIMC**, has disclosed in its Securities and Exchange Commission (SEC) filings the potential legal exposure regarding their fraudulent activities and curtailment misconduct.  In the **WIMC** Form 10-Q for the quarterly period ended June 30, 2013[1] **WIMC** relates:

> *"The Company has established a curtailment obligation liability of $44.8 million at June 30, 2013 related to the foregoing that reflects management's best estimate of the probable lifetime claim. This liability is recorded in payables and accrued liabilities. The Company assumed $38.8 million of this liability, which has a corresponding offset to goodwill, through the acquisition of RMS. The remaining $6.0 million was recorded as a provision during the three and six months ended June 30, 2013 in general and administrative expenses within the Company's*

---

[1] Please see Exhibit 1

> consolidated financial statements. The level of liability is difficult to estimate and
> requires significant management judgment as curtailment obligations are an emerging
> industry issue." (Walter Investment Management Corp. Securities and
> Exchange Commission Form 10-Q, 8 August 2013, p. 50)

The serious non-compliance issues and fraud expressed by Relator, **McDonald**, as

detailed in this complaint are further validated in the **WIMC** SEC filing Form 10-Q

for quarterly period ended September 30, 2013[2], as it is explained:

> "Subsequent to the completion of the acquisition of RMS, the Company discovered
> a failure by RMS to record certain liabilities to HUD, FHA and/or investors
> related to servicing errors by RMS. FHA regulations provide that servicers meet a
> series of event-specific timeframes during the default, foreclosure, conveyance, and
> mortgage insurance claim cycles. Failure to timely meet any processing deadline may
> stop the accrual of debenture interest otherwise payable in satisfaction of a claim
> under the FHA mortgage insurance contract and the servicer may be responsible to
> HUD for debenture interest that is not self-curtailed by the servicer, or for making
> the investor whole for any interest curtailed by FHA due to not meeting the required
> event-specific timeframes. The Company has established a curtailment obligation
> liability of $52.9 million at September 30, 2013 related to the foregoing which
> reflects management's best estimate of the probable lifetime claim. The curtailment
> liability is recorded in payables and accrued liabilities in the consolidated balance
> sheet. The Company assumed $46.0 million of this liability through the acquisition
> of RMS, which resulted in a corresponding offset to goodwill and deferred tax assets.
> The Company also recorded a provision related to the curtailment liability of $1.0
> million and $7.0 million during the three and nine months ended September 30,
> 2013, respectively, which is included in general and administrative expense in the
> consolidated statements of comprehensive income. The Company has potential
> financial statement exposure for an additional $142.2 million related to similar
> claims, which are reasonably possible, but which the Company believes are the
> responsibility of third parties (e.g., prior servicers and/or investors). The Company's
> potential exposure to this additional risk relates to the possibility that such third
> parties may claim that the Company is responsible for the servicing liability or that

---

[2] Please see Exhibit 2

*the Company exacerbated an existing failure by the third party.*" (Walter Investment Management Corp. Securities and Exchange Commission Form 10-Q, 6 November 2013, p. 51)

33.     Defendant, **Wells Fargo** also services FNMA loans, and **RMS** has solicited the servicing work on these loans.  In reviewing the **Wells Fargo** accounts, **Relator** has determined that **Wells Fargo** engages in the same fraudulent scheme as **RMS** and **BOA** (detailed above), by not complying with the preconditional acts of procuring an appraisal and/or initiating "first legal action" yet nevertheless filing insurance claims with HUD for reimbursement despite this non-compliance.

34.     The FHA Mutual Mortgage Insurance Fund for HECM (Home Equity Conversion Mortgages) is underwater by hundreds of millions of dollars, and the owners and servicers that get the benefit of this insurance have defrauded, continue to defraud HUD, and plan to continue to defraud HUD by hundreds of millions of dollars. **RMS** has a financial liability to HUD, FNMA and other investors (related to claims already submitted and paid by HUD), **BOA** and **Wells Fargo** have exposure as well.

35.     Further, Relator, **McDonald** had direct conversations with Mark Helm (CEO of **RMS**) in which Mr. Helm divulged his direct conversations with the CEO of **Celink** about **Celink** engaging in the same fraudulent scheme as **RMS** and other **Defendants** (detailed above), by not complying with the preconditional acts of procuring an appraisal and/or initiating "first legal action" yet nevertheless filing insurance claims with HUD for reimbursement despite this non-compliance.

36.     Additionally, Relator, **McDonald** had direct conversations with Leslie Flynn (CFO of **Walter**) in which Ms. Flynn divulged her direct conversations with executives at **Financial Freedom** detailing **Financial Freedom** engaging in the same fraudulent scheme as **RMS** and other **Defendants** (detailed above), by not complying with the preconditional acts of procuring an appraisal and/or initiating "first legal action" yet nevertheless filing insurance claims with HUD for reimbursement despite this non-compliance. Considering **Financial Freedom** is a major servicer of Fannie Mae loans (approximately 120,000 loans), the total exposure of **Financial Freedom** is significantly greater. Relator, **McDonald**, believes **Financial Freedom's** curtailment exposure could be upwards of two-hundred million dollars plus ($200,000,000.00+).

37.     Additionally, **RMS** has a subsidiary company, **RMS Asset Management Solutions, LLC** that has a contract with FNMA to handle the liquidation of all FNMA reverse mortgage properties that they have obtained through foreclosure. **RMS** also services approximately twenty thousand (20,000) reverse mortgage loans for FNMA, and as such forecloses on loans for FNMA. The disposition of these properties is then handled by **RMS Asset Management Solutions, LLC (AMS)**. Because of a rule (RESPA) that states **RMS** cannot be both the servicer and the seller, **RMS** would not be entitled to a real estate commission on the disposition of properties that it previously serviced. In order to circumvent this prohibition, **RMS** put another company (**Unified Real Estate Management**) as the selling company

on the closing statement (the HUD-1), even though it appears **Unified Real Estate Management (UREM)** is not performing the services represented. **UREM** then collects the commission at closing, keeps a small fee (approximately $100) and then sends the balance of the commission back to **RMS.** There has been over two-hundred fifty thousand dollars ($250,000.00) sent by **Unified Real Estate Management** to **RMS** related to this fraudulent kickback practice.

38.     **Relator** has first-hand knowledge of **RMS** policy changes; in particular that **RMS** was not self-curtailing per regulations. **RMS** put out a policy in May 2013 that they would be self-curtailing only for certain investors. In following discussions with **WIMC, RMS, and Green Tree**, it was decided to not self-curtail. **Relator** noted that **WIMC, RMS, and Green Tree** had agreed in writing to self-curtail for certain clients, therefore could not put out a blanket policy advising otherwise. **RMS** does not have a definitive policy which requires them to self-curtail (self-disclose) per HUD guidelines and CFR requirements, which would prevent these false and fraudulent claims from being filed in the future.

39.     Relator, **McDonald,** has knowledge of the fraudulent scheme conducted by **Defendants** through fraudulent claim and billing applications to the U.S. Department of Housing and Urban Development ("HUD") and FNMA.

40.     Relator, **McDonald,** took immediate steps with his employer, **WIMC,** to address the serious issues raised by the actions of **Defendants** of fraudulent billing applications to HUD and improper funds. Relator, **McDonald's**

opposition/complaints to **WIMC** have gone unheeded. This refusal by **WMIC** to cease their unlawful activities and remediate their unlawful practices have resulted in the compelled resignation of Relator **McDonald** from **WIMC**.

## VI. CAUSES OF ACTION
## COUNT I
## FALSE CLAIMS ACT VIOLATIONS (31 U.S.C. § 3729(a)(1)(A)(B)(C))

41. The allegations of the preceding paragraphs are re-alleged as if fully set forth herein.

42. **Defendants**, by and through its officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the United States Government, false or fraudulent claims for payment and approval.

43. **Defendants**, by and through its officers, agents and employees, knowingly made, used, or cause to be made or used, false records or statements, to get false or fraudulent claims paid or approved.

44. Based upon the false claims described above, **Defendants** directly or indirectly obtained payment from the United States Government for its services it provides to the mortgage industry.

45. **RMS**, by and through its officers, agents, and employees, knowingly made, used, or cause to be made or used, unlawful inducements to realtor firms to arrange kickbacks for commissions due on HUD closing statements.

46.     The United States Government has sustained damages because of the acts of the **Defendants**, as a result of the Defendants' violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)(B)(C).

47.     As set forth in the preceding paragraphs, **Defendants**, have knowingly violated 31 U.S.C. § 3729(a)(1)(A)(B)(C) and 42 U.S.C. §1320a-7b(b) and has thereby damaged the United States Government by its action in an amount to be determined at trial.

## COUNT II
## RETALIATION  (31 U.S.C. § 3730(h))

48.     *Qui tam* **Relator** realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 42 of this Complaint.

49.     The False Claims Act anti-retaliation provisions protect employees against... "threats," "harassment," and any other ... "discrimination." 31 U.S.C. § 3730(h); To state a valid claim for retaliation under 31 U.S.C. § 3730(h) Plaintiff must show (1) that he engaged in "protected conduct"; (2) that **WIMC/RMS/Green Tree** was aware of his actions, and (3) that he suffered an adverse employment action in retaliation for that conduct.

50.     **WIMC**, by and through its employees, has harassed and threatened Relator, **McDonald**, as a result of his investigation of and opposition to their fraudulent conduct.

51.     In violation of the False Claims Act § 3730(h), **WIMC** denied **McDonald** a position and jeopardized his employment opportunities in response to his investigation and initiation of this claim.

52.     As a result of **WIMC's** conduct, **Relator** suffered negative employment consequences, which jeopardized his reputation and employment, and ultimately resulted in his compelled resignation/constructive termination from **WIMC**. **Relator** has suffered damages, now and in the future, in response to his investigation and initiation of this claim.

## COUNT III

### FLORIDA FALSE CLAIMS ACT VIOLATIONS (Fla. Stat. § 68.081 *et seq.*)

53.     The allegations of the preceding paragraphs are re-alleged as if fully set forth herein.

54.     That is a *qui tam* action brought by **Relator** and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

55.     Fla. Stat. § 68.082(2) provides liability for any person who –

(a)     knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c)     conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

56.     Had the State of Florida known that **Defendants** were violating the federal and state laws cited herein, it would not have paid the claims submitted in connection with **Defendants'** fraudulent and illegal practices.

57.     As a result of **Defendants** violations of Fla. Stat. § 68.081 *et seq.*, the State of Florida has been damaged.

58.     There are no bars to recovery under Fla. Stat. § 68.081 *et seq.* and, or in the alternative, **Relator** is an original source as defined herein.   **Relator** is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

59.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida.

WHEREFORE, **Relator** respectfully requests this Court to award the following damages to the following Parties and against the **Defendants**.

To the **STATE OF FLORIDA**:

a.)     Three times the amount of actual damages that the State of Florida has sustained as a result of **Defendants'** fraudulent and illegal practices;

b.)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim that **Defendants** caused to be presented to the State of Florida;

c.)    Prejudgment interest; and

d.)    All costs incurred in bringing this action.

To **RELATOR:**

a.)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

b.)    Reimbursement for reasonable expenses that **Relator** incurred in connection with this action;

c.)    An award of reasonable attorney's fees and costs; and

d.)    Such further relief as this Court deems equitable and just.

## COUNT IV

## RETALIATION (Fla. Stat. § 448.101 - 448.105)

60.    *Qui tam* Relator, **McDonald** re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

61.    In violation of the False Claims Act § 3730(h), **WIMC** took the retaliation directed against Plaintiff as a result of his protected conduct gives rise to liability under the Florida Whistleblower Statute (F.S. § 448.101- 448.105). The Florida Whistleblower Statute prohibits retaliation against an employee who openly opposes a violation of 'law, rule, or regulation' (F.S. § 448.101(4)). Previously, Plaintiff **McDonald** openly complained about/opposed the fraudulent scheme engaged in by

**Defendants** of submitting incorrect claims to HUD for payment, in clear violation of the Federal False Claim Act.

62. In violation of the Florida Whistleblower Act, F.S. § 448.101(5), **WIMC** took adverse employment actions against **Relator** in response to his opposition to **Defendants** violation of the Federal False Claim Act.

63. As a result of **WIMC's** conduct, **Relator** suffered negative employment consequences, which jeopardized his reputation and employment, and ultimately resulted in his compelled resignation/constructive termination from **WIMC**. **Relator** has suffered damages, now and in the future, in response to his investigation and initiation of this claim and ultimate loss of employment.

## VII. PRAYER OF RELIEF

64. WHEREFORE, Relator, **McDonald**, on behalf of himself and the United States Government, prays:

(a) That this Court Order the **Defendants** to cease and desist from violating 31 U.S.C. § 3729(a)(1)(A)(B)(C);

(b) That **Relator** be awarded all relief necessary to make him whole, including but not limited to, two times his back pay, interest on the back pay, and compensation for all special damages sustained, including attorneys' fees and costs.

(c) That this Court enter judgement against **Defendants** in an amount equal to three times the amount of damages the United States Government has sustained because of this action, plus a civil penalty of at least $5,000 to $10,000 for

each action in violation of 31 U.S.C. § 3729(a)(1)(A)(B)(C), and the costs of this action with interest, including the costs of the United States Government for its expenses related to this action;

(d)     The **Relator** be awarded all costs incurred, including reasonable attorneys' fees;

(e)     That in the event the United States Government continues to proceed with this action, **Relator** be awarded an amount for bringing this action in the amount of at least fifteen percent (15%) but not more than twenty-five percent (25%) of the proceeds of the action or settlement of the claim;

(f)     That in the event the United States Government does not proceed with this action, **Relator** be awarded an amount that the court decides is reasonable for collecting the civil penalty and damages, which shall be not less than twenty-five percent (25%) nor more than thirty percent (30%) of the proceeds of the action settlement;

(g)     That a trial by jury be held on all issues;

(h)     That the United States Government and **Relator** receive any other relief, both at law and at equity, to which they may reasonably appear entitled.

(i)     That this Court Order **WIMC**, cease and desist from violating 31 U.S.C. § 3730(h) and **Relator** be awarded relief including; reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, two (2) times the amount of back pay, interest on the back pay, and

24

compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

(j)     That this Court Order **WIMC**, cease and desist from violating the Florida Whistleblower Act, F.S. § 448.101- 448.105.

(k)     **Relator** be awarded compensation for lost wages, benefits, and other remuneration and any other compensatory damages allowable at law.

## IX. DEMAND FOR JURY TRIAL

65.     Pursuant to Federal Rule of Civil Procedure 38, **Relator** demands a trial by jury. WHEREFORE, **Relator** respectfully requests all relief described herein.

Dated: December 4, 2013                                Respectfully submitted,

By:

**DAVID J. LINESCH, ESQ.**
Florida Bar No. 0376078
THE LINESCH FIRM, P.A.
700 Bee Pond Road
Palm Harbor, FL  34683
Telephone: (727) 786-0000
Facsimile: (727) 786-0974
E-mail: Laborlaw@Lineschfirm.com
Attorney for Plaintiff/Relator

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been hand delivered by courier to: Clerk, U. S. District Court 801 North Florida Avenue Tampa, Florida 33602 and mailed; postage prepaid, U.S. First Class Certified Mail, this 4 day of December, 2013 to:

| | |
|---|---|
| Office of The Attorney General<br>**Florida Attorney General**<br>The Capitol, PL 01<br>Tallahassee, Florida 32399-1050 | Office of the Attorney General<br>**U.S. Department of Justice**<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001 |
| Kyle Cohen, Esq.<br>**U.S. Attorney's Office**<br>400 North Tampa Street, Room 329<br>Tampa, Florida 33602 | |

By: _____

**DAVID J. LINESCH, ESQ.**
THE LINESCH FIRM, P.A.
Attorney for Plaintiff/Relator

26

# EXHIBIT 1

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

## Form 10-Q

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2013

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 001-13417

---

# Walter Investment Management Corp.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Maryland** | **13-3950486** |
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **3000 Bayport Drive, Suite 1100** | |
| **Tampa, FL** | **33607** |
| (Address of principal executive offices) | (Zip Code) |

**(813) 421-7600**
(Registrant's telephone number, including area code)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The registrant had 36,956,904 shares of common stock outstanding as of July 31, 2013.

Table of Contents

### Third-Party Servicing Agreements

The Company has entered into a third-party servicing agreement with ResCap as debtors in possession in the Chapter 11 case in the U.S. Bankruptcy Court, or the ResCap Estate, pursuant to which the ResCap Estate is providing, on a short-term basis, certain services with regard to employees that the Company acquired in connection with its acquisition of the ResCap net assets.

### Reverse Mortgage Servicing

The Company services loans originated and securitized by the Company or one of its subsidiaries and also services loans on behalf of securitization trusts or other investors. The Company's servicing obligations are set forth in servicing agreements with the applicable counterparty which generally specify the standard of responsibility for actions the Company takes as a servicer. These servicer agreements provide that the servicer may be liable for failure to perform its servicing obligations and further provide remedies for certain servicer breaches.

Subsequent to the completion of the acquisition of RMS, the Company discovered a failure to record certain estimated liabilities to investors relating to servicing errors by RMS. Federal Housing Administration, or FHA, regulations provide that servicers meet a series of event-specific timeframes during the default, foreclosure, conveyance, and mortgage insurance claim cycles. Failure to timely meet any processing deadline may stop the accrual of debenture interest otherwise payable in satisfaction of a claim under the FHA mortgage insurance contract and the servicer may be responsible for making the investor whole for any interest curtailment due to not meeting the required event-specific timeframes. The Company has established a curtailment obligation liability of $44.8 million at June 30, 2013 related to the foregoing that reflects management's best estimate of the probable lifetime claim. This liability is recorded in payables and accrued liabilities. The Company assumed $38.8 million of this liability, which has a corresponding offset to goodwill, through the acquisition of RMS. The remaining $6.0 million was recorded as a provision during the three and six months ended June 30, 2013 in general and administrative expenses within the Company's consolidated financial statements. The level of liability is difficult to estimate and requires significant management judgment as curtailment obligations are an emerging industry issue. The Company is in regular contact with HUD and other investors to monitor and address the current industry practices. While there may be opportunity to mitigate this loss, because of the uncertainty in the ultimate resolution of these matters as well as uncertainty in regards to the estimate underlying the curtailment obligation liability, there is potential financial statement exposures in excess of the recorded liability that are considered reasonably possible.

### Litigation

As discussed in Note 18, Walter Energy is in dispute with the IRS on a number of federal income tax issues. Walter Energy has stated in its public filings that it believes that all of its current and prior tax filing positions have substantial merit and that Walter Energy intends to defend vigorously any tax claims asserted. Under the terms of the tax separation agreement between the Company and Walter Energy dated April 17, 2009, Walter Energy is responsible for the payment of all federal income taxes (including any interest or penalties applicable thereto) of the consolidated group, which includes the aforementioned claims of the IRS. However, to the extent that Walter Energy is unable to pay any amounts owed, the Company could be responsible for any unpaid amounts.

On July 24, 2013, a putative shareholder class action complaint was filed in the United States District Court for the Middle District of Florida against the Company, Mark O'Brien, Charles Cauthen, Denmar Dixon, Marc Helm and Robert Yeary captioned Cummings, et al. v. Walter Investment Management Corp., et al., 8:13-cv-01916-JDW-TBM. The Complaint asserts federal securities law claims against the Company and the individual defendants under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; additional claims are asserted against the individual defendants under Section 20(a) of the Exchange Act. The complaint alleges that between May 9, 2012 and June 6, 2013 the Company and the individual defendants made material misstatements or omissions about the integrity of the Company's financial reporting, including the reporting of expenses associated with certain financing transactions, and the liabilities associated with the Company's acquisition of RMS. The complaint seeks unspecified damages on behalf of the individuals or entities which purchased or otherwise acquired the Company's securities from May 9, 2012 through June 6, 2013. The Company intends to defend the matter vigorously.

The Company is a party to a number of other lawsuits arising in the ordinary course of its business. While the results of such litigation cannot be predicted with certainty, the Company believes that the final outcome of such litigation will not have a materially adverse effect on the Company's financial condition, results of operations or cash flows.

# EXHIBIT 2

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

---

## Form 10-Q

---

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2013

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 001-13417

---

# Walter Investment Management Corp.

### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Maryland** | **13-3950486** |
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **3000 Bayport Drive, Suite 1100** | |
| **Tampa, FL** | **33607** |
| (Address of principal executive offices) | (Zip Code) |

**(813) 421-7600**
(Registrant's telephone number, including area code)

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Table of Contents

WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)

## 1. Business and Basis of Presentation

Walter Investment Management Corp., or the Company or Walter Investment, is a fee-based business services provider to the residential mortgage industry focused on providing specialty servicing for credit-sensitive residential mortgages and reverse mortgages. The Company also originates, purchases and sells mortgage loans into the secondary market. In addition, the Company is a mortgage portfolio owner of credit-challenged, non-conforming residential loans and reverse mortgage loans and operates an insurance agency serving residential loan customers. The Company operates throughout the United States, or U.S. At September 30, 2013, the Company serviced approximately 1.9 million accounts compared to 1.0 million accounts at December 31, 2012.

Throughout this Quarterly Report on Form 10-Q, references to "residential loans" refer to residential mortgage loans, including forward mortgage loans, reverse mortgage loans and participations, and residential retail installment agreements, which include manufactured housing loans, and references to "borrowers" refer to borrowers under residential mortgage loans and installment obligors under residential retail installment agreements.

### Acquisition of Reverse Mortgage Solutions, Inc.

On November 1, 2012, the Company acquired 100% of the outstanding shares of Reverse Mortgage Solutions, Inc., or RMS. Based in Spring, Texas, RMS provides a full suite of services to the reverse mortgage sector, including servicing, sub-servicing, loan origination and securitization, and related technology. The acquisition of RMS positioned the Company as a full service provider in the reverse mortgage servicing sector with new growth opportunities and represents an extension of the Company's fee-for-service business model. Refer to Note 3 for further information regarding the acquisition of RMS.

### Acquisition of Security One Lending

On December 31, 2012, in connection with the execution of a stock purchase agreement, the Company agreed to acquire all of the outstanding shares of Security One Lending, or S1L. Based in San Diego, California, S1L is a retail and wholesale reverse mortgage loan originator. S1L has a long-standing relationship with RMS, as S1L has been delivering loans using RMS' technology and RMS has acquired a significant amount of S1L's reverse origination production during recent years. The acquisition of S1L has enhanced RMS' position as an issuer of reverse mortgage product, while also significantly increasing RMS' retail origination presence. The Company obtained effective control over S1L through an economic closing on December 31, 2012. A legal closing subsequently occurred on April 30, 2013. The economic closing required acquisition method accounting in accordance with the authoritative accounting guidance for business combinations. Accordingly, the financial results for S1L have been included in the Company's consolidated financial statements beginning on December 31, 2012. Refer to Note 3 for further information regarding the acquisition of S1L.

### Acquisition of Certain Net Assets of Residential Capital LLC

The Company previously announced its joint bid with Ocwen Loan Servicing LLC to acquire certain mortgage-related net assets held by Residential Capital LLC, or ResCap, in an auction sponsored by the U.S. Bankruptcy Court. Pursuant to this agreement, the Company agreed to acquire the rights and assume the liabilities relating to all of ResCap's Federal National Mortgage Association, or Fannie Mae, mortgage servicing rights, or MSRs, and related servicer advances, and ResCap's mortgage originations and capital markets platforms, or the ResCap net assets. The Company closed on its acquisition of the ResCap net assets on January 31, 2013. The acquisition of the ResCap net assets provided the Company with a fully integrated loan originations platform to complement and enhance its servicing business. Refer to Note 3 for further information regarding the acquisition of the ResCap net assets.

### Acquisition of Certain Net Assets of Ally Bank

On March 1, 2013, the Company acquired the correspondent lending and wholesale broker businesses of Ally Bank, or the Ally Bank net assets. The acquisition of the Ally Bank net assets has allowed the Company to pursue correspondent lending opportunities using the capabilities resident in the ResCap originations platform. Refer to Note 3 for further information regarding the acquisition of the Ally Bank net assets.

### Acquisition of Certain Net Assets of MetLife Bank, N.A.

On March 1, 2013, the Company purchased the residential mortgage servicing platform, including certain servicing related technology assets, of MetLife Bank, N.A. located in Irving, Texas, or the MetLife Bank net assets. The acquisition of the residential mortgage servicing platform is serving to support the Company's development of a robust dual-track residential mortgage servicing platform. Refer to Note 3 for further information regarding the acquisition of the MetLife Bank net assets.

Table of Contents

In connection with the forward sales commitments and MBS purchase commitments, the Company has entered into collateral agreements with its counterparties whereby both parties are required to maintain cash deposits in the event the fair values of the derivative financial instruments meet established thresholds. The right to receive cash collateral placed by the Company with its counterparties is included in other assets, and the obligation to return collateral received by the Company from its counterparties is included within payables and accrued liabilities. The Company has elected to record derivative assets and liabilities and related collateral on a gross basis, even when a legally enforceable master netting arrangements exist between the Company and the derivative counterparty.

The derivative transactions described above are measured in terms of the notional amount. The notional amount is generally not exchanged and is used only as a basis on which interest and other payments are determined.

### Servicing Rights

Servicing rights are an intangible asset representing the right to service a portfolio of loans. Capitalized servicing rights historically related to servicing and sub-servicing contracts acquired in connection with business combinations. Additionally, the Company has recently acquired the rights to service loans through the purchase of such rights from third parties or through the transfer of purchased or originated loans with servicing rights retained. Servicing rights are recorded at fair value at inception and are subsequently accounted for using the amortization method or the fair value measurement method, based on the Company's strategy for managing the risks of the underlying portfolios. Risks inherent in servicing rights include prepayment and interest rate risks. Refer to Note 11 for information regarding accounting for servicing rights.

The Company identifies classes of servicing rights based upon the availability of market inputs used in determining their fair values and its planned risk management strategy associated with the servicing rights. Based upon these criteria, the Company has identified three classes of servicing rights: a risk-managed forward loan class, or the risk-managed loan class, a forward loan class and a reverse loan class. The risk-managed loan class includes loan portfolios for which the Company could apply a hedging strategy in the future. Servicing assets associated with the forward loan class and the reverse loan class are amortized based on expected cash flows in proportion to and over the life of net servicing income. Amortization is recorded as a reduction to servicing revenue and fees in the consolidated statements of comprehensive income. Servicing assets are stratified by product type and compared to the estimated fair value on a quarterly basis. Impairment is recognized through a valuation allowance for each stratum. The valuation allowance is adjusted to reflect the amount, if any, by which the carrying value of the servicing rights for a given stratum exceeds its fair value. Any fair value in excess of the carrying value for a given stratum is not recognized. The Company recognizes a direct impairment to the servicing asset when the valuation allowance is determined to be unrecoverable.

For servicing assets associated with the risk-managed loan class, which are accounted for at fair value, the Company measures the fair value at each reporting date and records changes in fair value in net servicing revenue and fees in the consolidated statements of comprehensive income.

### Curtailment Liability

The Company is required to service its portfolio of loans on behalf of third parties in accordance with certain regulations established by the Department of Housing and Urban Development, or HUD, and GSEs. In certain instances in which servicing requirements are not followed or certain timelines are missed, referred to as servicing errors, the Company is potentially exposed to a curtailment of interest which results in an obligation to the investor in the loans or to HUD depending on facts and circumstances surrounding the servicing error. The Company generally accounts for its obligations for servicing errors as loss contingencies and records accruals for expected losses when the losses are deemed both probable and able to be reasonably estimated. The Company believes it has adequately accrued for these potential liabilities, however, facts and circumstances may change which could cause the actual liabilities to exceed the estimates, or which may require adjustments to the recorded liability balance in the future. Refer to the Mortgage Servicing section of Note 22 for further information relating to servicing errors.

12

Table of Contents

*Bank of America Asset Purchase*

On January 31, 2013, the Company purchased Fannie Mae MSRs, from Bank of America, N.A., or BOA, for total consideration of $495.7 million, of which $487.7 million was paid as of September 30, 2013 and $8.0 million is included in payables and accrued liabilities in the consolidated balance sheet. At closing, the Fannie Mae MSRs were associated with loans totaling $84.4 billion in unpaid principal balance. As part of the asset purchase agreement, BOA is to provide sub-servicing on an interim basis while the loan servicing is transferred in tranches to the Company's servicing systems. As each tranche is boarded, the Company is also obligated to purchase the related servicer advances associated with the boarded loans. From the date of the closing through September 30, 2013, the Company has purchased $682.6 million of servicer advances as part of the asset purchase agreement. The Company anticipates that all remaining expected servicing transfers of $2.0 billion in loans will be completed by December 2013 and BOA will cease to be the sub-servicer. Refer to Note 11 for further information regarding servicing rights.

*Reverse Mortgage Solutions, Inc.*

On November 1, 2012, the Company acquired all of the outstanding shares of RMS. The purchase consideration of $136.3 million was allocated to the assets acquired and liabilities assumed based on management's estimates of their fair values as of the acquisition date. Measurement period adjustments were recorded during the nine months ended September 30, 2013 for certain assumed contingent liabilities existing at the acquisition date. The table below summarizes the originally reported estimated acquisition date fair values, measurement period adjustments recorded, and the adjusted preliminary purchase price allocation of assets acquired and liabilities assumed (in thousands):

|  | Originally Reported at Dec 31, 2012 | Measurement Period Adjustments | Adjusted Preliminary |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash | $ 19,683 | $ — | $ 19,683 |
| Restricted cash | 1,401 | — | 1,401 |
| Residential loans | 5,331,989 | — | 5,331,989 |
| Receivables | 11,832 | — | 11,832 |
| Servicer and protective advances | 17,615 | — | 17,615 |
| Servicing rights | 15,916 | — | 15,916 |
| Goodwill | 101,199 | 28,800 | 129,999 |
| Intangible assets | 20,800 | — | 20,800 |
| Premises and equipment | 15,633 | — | 15,633 |
| Deferred tax asset, net | 19,052 | 17,159 | 36,211 |
| Other assets | 13,245 | — | 13,245 |
| Total assets acquired | 5,568,365 | 45,959 | 5,614,324 |
| **Liabilities** |  |  |  |
| Payables and accrued liabilities | 29,357 | 45,959 | 75,316 |
| Debt | 148,431 | — | 148,431 |
| HMBS related obligations | 5,254,231 | — | 5,254,231 |
| Total liabilities assumed | 5,432,019 | 45,959 | 5,477,978 |
| Fair value of net assets acquired | $ 136,346 | $ — | $ 136,346 |

*Security One Lending*

The purchase price of the S1L acquisition in the fourth quarter of 2012 included contingent earn-out payments to be paid in cash of up to $10.9 million dependent on the achievement of certain designated performance targets over the twelve months following the acquisition. The Company recorded a liability for the contingent earn-out payments of $6.1 million at December 31, 2012 based on the Company's estimate of the fair value of the contingent earn-out payments at that time. At June 30, 2013, the Company revised its estimate of the fair value of contingent earn-out payments to $10.9 million, the maximum earn-out, based on S1L's performance during the six months ended June 30, 2013 and recorded losses related to this estimate of $4.8 million during this time period. Other than a payment of $4.3 million made to the prior owners of S1L during the three months ended September 30, 2013, no subsequent adjustments to fair value have been made. Contingent earn-out payments of $6.6 million and $6.1 million at September 30, 2013 and December 31, 2012, respectively, are included in payables and accrued liabilities in the consolidated balance sheets. The losses on contingent earn-out payments are included in other net fair value gains in the consolidated statements of comprehensive income.

15

Table of Contents

### Third-Party Servicing Agreements

The Company has entered into a third-party servicing agreement with ResCap as debtors in possession in the Chapter 11 case in the U.S. Bankruptcy Court, or the ResCap Estate, pursuant to which the ResCap Estate is providing, on a short-term basis, certain services with regard to employees that the Company acquired in connection with its acquisition of the ResCap net assets.

### Mortgage Servicing

The Company services loans originated and securitized by the Company or one of its subsidiaries and also services loans on behalf of securitization trusts or other investors. The Company's servicing obligations are set forth in industry regulations established by HUD/FHA and in servicing and sub-servicing agreements with the applicable counterparties, such as Fannie Mae and other investors. Both the regulations and the servicing agreements provide that the servicer may be liable for failure to perform its servicing obligations and further provide remedies for certain servicer breaches.

Subsequent to the completion of the acquisition of RMS, the Company discovered a failure by RMS to record certain liabilities to HUD, FHA and/or investors related to servicing errors by RMS. FHA regulations provide that servicers meet a series of event-specific timeframes during the default, foreclosure, conveyance, and mortgage insurance claim cycles. Failure to timely meet any processing deadline may stop the accrual of debenture interest otherwise payable in satisfaction of a claim under the FHA mortgage insurance contract and the servicer may be responsible to HUD for debenture interest that is not self-curtailed by the servicer, or for making the investor whole for any interest curtailed by FHA due to not meeting the required event-specific timeframes. The Company has established a curtailment obligation liability of $52.9 million at September 30, 2013 related to the foregoing which reflects management's best estimate of the probable lifetime claim. The curtailment liability is recorded in payables and accrued liabilities in the consolidated balance sheet. The Company assumed $46.0 million of this liability through the acquisition of RMS, which resulted in a corresponding offset to goodwill and deferred tax assets. The Company also recorded a provision related to the curtailment liability of $1.0 million and $7.0 million during the three and nine months ended September 30, 2013, respectively, which is included in general and administrative expense in the consolidated statements of comprehensive income. The Company has potential financial statement exposure for an additional $142.2 million related to similar claims, which are reasonably possible, but which the Company believes are the responsibility of third parties (e.g., prior servicers and/or investors). The Company's potential exposure to this additional risk relates to the possibility that such third parties may claim that the Company is responsible for the servicing liability or that the Company exacerbated an existing failure by the third party. The actual amount, if any, of this exposure is difficult to estimate and requires significant management judgment as curtailment obligations are an emerging industry issue. Moreover, the Company is and will continue to pursue mitigation efforts to reduce both the direct exposure and the reasonably possible third party related exposure.

### Litigation

As discussed in Note 18, Walter Energy is in dispute with the IRS on a number of federal income tax issues. Walter Energy has stated in its public filings that it believes that all of its current and prior tax filing positions have substantial merit and that Walter Energy intends to defend vigorously any tax claims asserted. Under the terms of the tax separation agreement between the Company and Walter Energy dated April 17, 2009, Walter Energy is responsible for the payment of all federal income taxes (including any interest or penalties applicable thereto) of the consolidated group, which includes the aforementioned claims of the IRS. However, to the extent that Walter Energy is unable to pay any amounts owed, the Company could be responsible for any unpaid amounts.

On July 24, 2013, a putative shareholder class action complaint was filed in the United States District Court for the Middle District of Florida against the Company, Mark O'Brien, Charles Cauthen, Denmar Dixon, Marc Helm and Robert Yeary captioned Cummings, et al. v. Walter Investment Management Corp., et al., 8:13-cv-01916-JDW-TBM. The complaint asserted federal securities law claims against the Company and the individual defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Additional claims were asserted against the individual defendants under Section 20(a) of the Exchange Act. The complaint alleged that between May 9, 2012 and June 6, 2013 the Company and the individual defendants made material misstatements or omissions about the integrity of the Company's financial reporting, including the reporting of expenses associated with certain financing transactions, and the liabilities associated with the Company's acquisition of RMS. The complaint sought unspecified damages on behalf of the individuals or entities which purchased or otherwise acquired the Company's securities from May 9, 2012 through June 6, 2013. On October 2, 2013, the plaintiff in the action filed a Notice of Voluntary Dismissal Without Prejudice. On October 3, 2013, the Court dismissed the action without prejudice and directed the clerk to close the case.

On October 2, 2013, the Company received a subpoena from the HUD Office of Inspector General requesting documents and other information concerning (i) the curtailment of interest payments on HECM loans serviced or sub-serviced by RMS and (ii) RMS' contractual arrangements with a third party vendor for the management and disposition of real estate owned properties. The Company is responding to the subpoena and at this stage does not have sufficient information to make an assessment of the outcome or impact of HUD's investigation.